## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**THE UNITED STATES OF AMERICA**
*ex rel.* **MICHAEL L. DAVIS,**
1412 5th Street, NW
Washington, D.C. 20001

           Plaintiff,

    v.

**THE DISTRICT OF COLUMBIA,**
John A. Wilson Building
1350 Pennsylvania, N.W.
Washington, D.C. 20004

           Defendant.

DATE STAMP: 03/15/2006

CASE NUMBER 1:06CV00489

JUDGE: Richard W. Roberts

DECK TYPE: General Civil

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff United States of America, through a Relator, Michael L. Davis ("Davis" or "Relator"), brings this action pursuant to 31 U.S.C. § 3730(b)(1) against Defendant the District of Columbia ("D.C." or "the District") to recover Federal monies that Defendant wrongfully obtained from the Medicaid Program through false or fraudulent conduct, alleging as follows:

## NATURE OF THE ACTION

1.     This action arises under the False Claims Act ("FCA"), as amended, 31 U.S.C. § 3729 et seq., and is brought by Relator Davis on behalf of the United States pursuant to 31 U.S.C. § 3730(b)(1).

2.     The United States alleges that the Government of the District of Columbia, acting through the Office of the Chief Financial Officer ("OCFO") misappropriated approximately $147 million or more in Federal Medicaid funds. Specifically, after D.C. General Hospital ("D.C. General") and its clinics identified and reported additional Medicaid reimbursements totaling

approximately $210 million, the District's Chief Financial Officer ("DC-CFO"), acting in his official capacity on behalf of the District, caused a drawdown from the District's Medicaid account of the Federal Financial Participation, or "FFP," associated with such reimbursements, totaling approximately $147 million. These Medicaid funds were then withheld fraudulently from D.C. General, and instead were commingled with the general funds of the District of Columbia, where they were used to improve the District's financial status, and to pay for all manner of government functions wholly unrelated to the provision of care under the Medicaid Program. In doing so, the District Government disregarded Federal law and regulations establishing that Medicaid funds are to be paid only to eligible Medicaid recipients or under assignment to an eligible Medicaid provider, *i.e.*, a certified provider of healthcare services with an active Medicaid Provider Number, such as D.C. General. Because the District Government is not (and never has been) an approved Medicaid provider, and because it was not the entity providing care to eligible Medicaid recipients, it was not eligible to receive or retain the $210 million in Medicaid funds at issue here.

3.      After the misappropriation of these Medicaid monies, and knowing that the District's Medical Assistance Administration ("MAA"), the District agency charged with administering the Medicaid Program, had not made any payment to D.C. General for these Medicaid services, the District Government falsely certified to the Centers for Medicare & Medicaid Services ("CMS"), the Federal agency within the U.S. Department of Health and Human Services ("HHS") that oversees the Medicaid Program, that it had actually paid the approximately $210 million in reimbursements to an approved provider, and that the District was therefore entitled to a FFP of 70% of those monies (*i.e.*, approximately $147 million). Because no portion of the $210 million was ever paid to D.C. General, or any other providers, that certification was false and the related FFP the District obtained from CMS was therefore fraudulently obtained.

4.      The District Government acted with actual knowledge, deliberate ignorance, and/or with reckless disregard of the Medicaid laws and regulations by withdrawing approximately $147 million or more in Medicaid funds for purposes other than to reimburse actual Medicaid providers for the care provided to eligible Medicaid recipients. And, the District made one or more false certifications to the Federal Medicaid Program with actual knowledge of their falsity or in deliberate ignorance and/or reckless disregard of the truth or falsity of the certifications, when claiming that approximately $210 million in reimbursements were paid to D.C. General.

## JURISDICTION & VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345.

6.      The Court has personal jurisdiction over the defendant pursuant to 31 U.S.C. § 3732(a), because the D.C. Government resides, transacts business, and committed acts in violation of law actionable under 31 U.S.C. § 3729 within this District.

7.      Venue is proper under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b).

## PARTIES

8.      The United States brings this action on behalf of HHS and CMS (formerly known as the Health Care Financing Administration ("HCFA")).

9.      Relator Davis is a resident of Maryland, and was and is Chairman of the Board, President, and Chief Executive Officer of Davis & Associates, Inc., a corporation operating and existing under the laws of the District of Columbia. In 1998, Davis & Associates contracted with the D.C. Public Benefit Corporation ("PBC"), the legal entity that operated D.C. General, to undertake an extensive analysis of Medicare and Medicaid claims for services provided by D.C. General and its clinics between fiscal years ("FYs") 1994 and 1998. Davis & Associates was later

asked to perform a similar analysis on claims for services provided in FY 1999 as well. Davis is an original source of the information and allegations contained in this Complaint.

10.     The District is a municipal corporation, which operates under an elected Mayor-Council form of government. As a municipal corporation, the District is a "person" subject to suit under the False Claims Act. Although the District is not a state, it is eligible to participate in the Federal Medicaid Program.

## FACTUAL ALLEGATIONS

### *Entities of Interest*

11.     The PBC was created by the D.C. Council in 1996 as "an independent instrumentality of the District Government and having a separate legal existence within the government [for t]he primary purpose ... [of] provid[ing] community-centered health care for the benefit of the residents of the District of Columbia." D.C. Code § 32-262.2(a)&(b) (1999) (repealed). The PBC was expressly empowered, among other things, to sue and be sued in its own name, and to "operate, manage, superintend, maintain, repair, equip, and control any health facility under its jurisdiction. . . ." *Id.* § 32-262.5. Upon creation, the PBC assumed management and control over the "assets, property, records, and obligations" of D.C. General and its community clinics formerly operated by the Commission of Public Health of the Department of Human Services. *Id.* § 32-262.7(a)(4). The PBC was governed by a thirteen member Board of Directors, with six members of the board appointed by the Mayor and five appointed by the Council; the DC-CFO served as an *ex officio* voting member. *Id.* § 32-262.3(a). At all times relevant to this Complaint, approximately 1998 to 2001, the PBC was the independent legal entity that operated D.C. General and its clinics.

12.     At the time the PBC was created, the District of Columbia Health and Hospital Public Benefit Corporation Fund ("the PBC Fund") was established, and the Mayor was directed

4

to transfer to it "the unexpended balances of appropriations, allocations, and other funds of the . . .
D.C. General" and the clinics. *Id.* §§ 32-262.6, 32-262.7(a)(5). The PBC Fund contained money
allocated for D.C. General and the clinics, and was thereafter operated by the PBC. *Id.*
§ 32-262.6(b). By law, "monies in the [PBC] Fund shall not be a part of, nor lapse into, the
General Fund of the District or any other fund of the District." *Id.* § 32-262.6(b). Further, "any
and all dedicated revenues collected by the Mayor as agent for the [PBC] shall be deposited in the
[PBC] Fund on a monthly basis for the payment of all expenses incurred by the [PBC]." *Id.*
§ 32-262.6(c).

13.    D.C. General traced its lineage back 200 years, to the founding of the Washington
Infirmary, the District's first public hospital, in 1806. Throughout its history D.C. General served
as the primary – and often only – source of healthcare for traditionally underserved populations in
the District. At the times relevant to this Complaint, D.C. General was the only public hospital in
the District, and provided a full range of preventative and curative healthcare services, primarily to
the poor and indigent, minorities, women, children, the elderly, and other traditionally underserved
populations. D.C. General operated one of the few Level 1 trauma centers in the District, and the
only one not located in its Northwest section. The District Government declared D.C. General
"bankrupt" in 2001, and closed the Hospital despite strenuous objection from prominent local and
national public health officials, advocates for the poor, and civil rights leaders.

14.    The District's Department of Health is an agency of the District Government
charged with promoting and protecting the health, safety, and quality of life of residents and
visitors to the District. The MAA exists within the Department of Health and is the single "state"
agency with the responsibility for implementation and administration of the District's Medicaid
Program. The MAA acts pursuant to the legal requirements set forth in Title XIX of the Social

Security Act, CMS rules and regulations, the District's "state plan" as approved by CMS ("the District's Medicaid plan"), and District law. In 2005, MAA served more than one-quarter of all District residents – more than 140,000 people – and spent or disbursed over $1.2 billion dollars for healthcare.

15.    The OCFO was established by the District of Columbia Financial Responsibility and Management Assistance Act of 1995, Pub. L. No. 104-8 ("the Control Board Act"), in part to "examine the programmatic and structural relationship between the District government and the Federal Government." Pub. L. No. 104-8 § (b)(7). All other fiscal control agencies of the District Government, including the Office of the Treasurer, the Controller, the Office of the Budget, the Office of Financial Information Services, and the Department of Finance and Revenue were transferred into, and placed within the direct authority of, the OCFO. *See id.* § 302(a)(2)-(3). The CFOs for individual District agencies were also placed within the reporting structure of the OCFO. Through this ultimate authority over all fiscal matters concerning the District Government, the DC-CFO is and was able to direct all financial transactions concerning the District Government, including transactions involving the dedicated account into which CMS deposits the FFP for District Medicaid spending ("the District's Medicaid account"). The DC-CFO position was held by Valerie Holt up until May 5, 2000; Dr. Natwar Gandhi ("Gandhi") has been the DC-CFO from 2000 through the present.

16.    Mitchell & Titus is a public accounting firm operating in the District of Columbia. For a number of years Mitchell & Titus served as the lead auditors for the District Comprehensive Annual Financial Reports ("CAFR") including the CAFR for FY 1999, which ended on September 30, 1999. The lead auditor for the District at Mitchell & Titus was managing partner Gregory

Holloway.  Mitchell & Titus was also retained, under a separate contract, as the independent

auditor of the PBC's FY 1999 financial statements.

*The False Claims Act*

17.     The False Claims Act provides, in pertinent part that:

(a) Any person who –
    (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
    (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
    (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;
                                   * * *
is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . .
                                   * * *
(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information –
    (1) has actual knowledge of the information;
    (2) acts in deliberate ignorance of the truth or falsity of the information; or
    (3) acts in reckless disregard of the truth or falsity of the information,
    and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(a) – (b).

*Federal Healthcare Programs*

18.     Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq., sets forth the

requirements for Federal Grants To States For Medical Assistance Programs, popularly known as

the Medicaid Program.  The Secretary of HHS administers the Medicaid Program through CMS, a

component of HHS.

19.     The Medicaid Program enables states, U.S. territories, and the District of Columbia to provide medical assistance to "families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and rehabilitation and other services. . . ." 42 U.S.C. § 1396.

20.     The District is required to have a CMS-approved "state plan" for medical assistance, as set forth in §§ 1396 and 1396a, in order to participate in the Medicaid Program and receive Federal Medicaid funds.  By law, the District's Medicaid plan must "provide that no payment under the plan for any care or service provided to an individual shall be made to anyone other than such individual or the person or institution providing such care or service, under an assignment or power of attorney or otherwise. . . ." *Id.* § 1396a(a)(32).  Further, 42 C.F.R. § 447.10, which implements this section of the statute, states that only a "provider" – *i.e.*, a certified person or entity with an approved Medicaid Provider Number, such as D.C. General – may receive payments for Medicaid services.

21.     Medicaid is a joint "State and Federal program."  As prescribed by Federal and State regulations, the District, through MAA, is obligated to contribute thirty percent (30%) of all Medicaid funds spent under the District's Medicaid plan, while the Federal Government, through CMS, must contribute the remaining seventy percent (70%).  *Id.* §1396d(b)(3).  The share provided by CMS is referred to as the "Federal Financial Participation," or "FFP."

22.     Through cooperation with MAA, CMS deposits the FFP portion of the District's projected Medicaid spending into the District's Medicaid account.  The District Government is also supposed to deposit its 30% share of projected Medicaid spending into the District's Medicaid account. The monies in the District's Medicaid account are then, by law, to be disbursed directly to eligible Medicaid recipients or under assignment to Medicaid providers as reimbursement for

medical services actually provided to eligible recipients under the District's Medicaid plan. *Id*. §1396a(a)(1)(32); 42 C.F.R. §447.10.

23.    MAA files quarterly reports with CMS through a paper or electronic form known as the "CMS-64 form" (formerly the "HCFA-64 form"). The CMS-64 reports to CMS how much MAA has actually paid to Medicaid providers and beneficiaries in the previous quarter. Thus, the CMS-64 allows CMS to compare the District's actual Medicaid spending with the amount that was projected at the beginning of the year. When actual Medicaid spending exceeds the projected spending, CMS deposits additional funds into the District's Medicaid account to make up the FFP portion of the shortfall. On the CMS-64, MAA is only required to account for its expenditures in broad categories, (*e.g.*, payments for inpatient hospital services). Thus, MAA does not report payments to specific providers on the CMS-64. MAA is, however, obligated to retain the records supporting the spending it claims on a CMS-64, and must provide those supporting records to CMS, if requested. CMS reserves the right to audit MAA's records to ensure accuracy of the CMS-64 claims.

24.    In addition to standard Medicaid payments for services rendered to eligible recipients under the District's Medicaid plan, D.C. General also qualified during the relevant periods for additional reimbursements under Medicaid's Disproportionate Share Hospital ("DSH") Program. DSH monies are available to Medicaid providers that, like D.C. General, serve a disproportionate number of low income patients with special needs and meet the qualifying criteria set forth in the District's Medicaid plan. 42 U.S.C. § 1396r-4. Like regular Medicaid claims, DSH payments consist of 70% FFP with the remainder coming from the District. Quarterly DHS Adjustment Payments are also reported on the CMS-64.

*The Relator's Background And Knowledge*

25.     Relator Davis, through his company Davis & Associates, is in the business of examining and preparing claims for Medicare and Medicaid reimbursements made by healthcare providers, and identifying additional reimbursements for which such providers are entitled under applicable regulations.

26.     Davis & Associates had a contract with the PBC to review Medicaid and Medicare claims for services provided by D.C. General and its clinics.  In 1998, the PBC asked Davis to undertake a comprehensive review of D.C. General and the clinics, which were perennially seen as operating in the red, and which District officials, such as DC-CFO Holt, the Mayor (who was formerly the DC-CFO), and the Financial Control Board, had publicly blamed for the District's financial problems.  Davis & Associates undertook an extensive and thorough analysis of all Medicare and Medicaid cost reports and reimbursement claims for services provided by D.C. General and its clinics between FY 1994 and 1998.  Davis was later asked to expand this analysis to include cost reports and reimbursements for FY 1999.

27.     In performing its contract for the PBC, Davis & Associates conducted a detailed and meticulous review of many thousands of pages of medical records, claims, billing statements, legal documents, and financial and other records from D.C. General, the District's Department of Health, MAA, the District's Medicaid Auditors (Bert Smith & Co.), and Federal Medicaid and Medicare rules, regulations, and other documents.  Davis & Associates also retained the services of numerous legal, financial, and medical experts for the purpose of supporting the legitimacy of each additional claim identified on behalf of D.C. General.  In addition, in order to determine the amount of DSH payments to which D.C. General might be entitled to, it was also necessary for Davis & Associates to examine, report, and support information regarding the low income demographics of D.C. General's patients.

28.     In its initial report to the PBC, delivered in the summer of 1999, Davis &

Associates identified more than $180 million in Medicaid and Medicare reimbursements owed to

the PBC, almost all of which (more than $175 million) was related to services provided under the

District's Medicaid plan and reimbursable from the District's Medicaid account.  These findings,

accompanied by the key supporting documents, were compiled into a report for the PBC.  That

report is referred to by those familiar with it as the "Black Book" – so called because it was

initially distributed in a black binder.

29.     In August 1999, Davis presented the Black Book to the PBC, and held a meeting to

explain the contents of the Black Book and provide additional support for the claims that Davis &

Associates had identified.  Present at this August 1999 meeting were PBC officials, including the

executive staff of D.C. General, representatives from the OCFO, and the District's (and the PBC's)

financial auditor (Mitchell & Titus).  The PBC/D.C. General personnel welcomed the Davis &

Associates report, and after studying the supporting documents, determined to include all of the

Black Book claims as receivables on the PBC's financial statements.

30.     Because the District would be responsible for contributing thirty percent (30%) of

the Black Book Medicaid claims, an entry of the $175 million in Medicaid claims on D.C.

General's books would create a corresponding liability of thirty percent (30%) of that amount

($52.5 million) on the District's books.  The Black Book also identified an additional $55 million

in "state" Medicaid participation money that the District had wrongfully withheld from the PBC as

an "offset payment" on a fraudulent "loan" the District Government claimed to have made to the

PBC.  The PBC, at Davis's urging, obtained a legal opinion from a law firm stating that the "loan"

had been fraudulent, and that any purported settlement of the debt by the District Government was

therefore illegal – leaving the $55 million as an outstanding amount owed to the PBC.  The legality

of the "loan" has also been publicly called into question by the Federal Office of Management and Budget ("OMB") in testimony before a Congressional subcommittee.

31.    In 2000, after some of the fraudulent conduct identified below had already occurred, the PBC asked Davis & Associates to review D.C. General's FY 1999 cost report for accuracy and completeness. As a result of this review, Davis & Associates identified approximately $40 million in additional Medicaid reimbursements owed to D.C. General for that fiscal year. This brought the total additional Medicaid reimbursements identified by Davis & Associates that were owed to D.C. General to more than $210 million.

*Fraudulent Conduct*

32.    In September 1999, shortly before the end of the District's fiscal year, John Fairman, Chief Executive Officer of the PBC, informed Davis that Gregory Holloway, the District's lead auditor at Mitchell & Titus, wanted to have a "secret meeting" with Davis & Associates and the top officers of the PBC at Ruth's Chris Steakhouse, located on Connecticut Avenue in the District. The purpose of this meeting was to discuss the implications of the Black Book on the District's FY 1999 financial statements.

33.    The secret meeting with Mr. Holloway occurred on or about September 19, 1999, and was attended, from Davis & Associates by Davis, and Irvin Bloom (Exec. VP for Health) and, from the PBC, by Mr. Fairman (CEO), Dee Hunter (Chief of Staff), and Earl Cabel (CFO). At the meeting, Mr. Holloway informed Davis that Mitchell & Titus had decided not to include the Black Book claims as receivables on the PBC's books. By omitting the $180 million receivable on the PBC's books, Mitchell & Titus was able to also omit the corresponding $55 million liability for the District's share of the Medicaid money from the District's finances (thereby improving the financial picture of the District). Omitting the sizeable receivable from the PBC's books also allowed Mitchell & Titus, the OCFO, the Mayor, the Financial Control Board, and other D.C.

officials to represent the PBC (and D.C. General in particular) as insolvent – a position consistent with their political goal of "solving" the District's financial problems by eliminating costly healthcare services for the traditionally underserved.

34.    Davis advised Holloway and the others present that, under generally accepted accounting principles ("GAAP"), the $180 million in reimbursements identified in the Black Book constituted a material claim, and therefore Mitchell & Titus was required to identify these claims, even if only as a disputed amount in a note to the financial statements. Holloway responded that he had already discussed this with the DC-CFO (Holt), members of the District Financial Control Board, and other District officials, including people in the Mayor's office, and that a decision had been made to omit all mention of the Black Book claims from the financial records of both the District and the PBC. This accounting fraud was possible, in part, because Mitchell & Titus served as the "independent" auditor for both the District and the PBC, and was acting under the direct influence of the OCFO.

35.    In April 2000, the OCFO, the Mayor, the Financial Control Board, and the District Council released the District's comprehensive financial report for FY 1999. As stated, this report omitted all reference to the PBC claims identified in the Black Book. On or about May 6, 2000, Dr. Natwar Gandhi was appointed DC-CFO, replacing Valerie Holt.

36.    One of the effects of the accounting fraud perpetuated in the District's and PBC's FY 1999 financial statements was to deny D.C. General receipt of the reimbursements identified in the Black Book. Because D.C. General did not receive such reimbursements, Davis & Associates also did not get paid under its contract for the extensive work it had successfully performed on behalf of the PBC.

37.     Between April and August 2000, Davis sought to bring the fraudulent omission of the Black Book claims to the attention of numerous District officials, including the following: DC-CFO Gandhi; Alice Rivlin (Chair of the Financial Control Board); Eugene Kinlow (Member of the Control Board); other Members and Staff of the Control Board; Mayor Anthony Williams; John Koskinen (Deputy Mayor/City Administrator); and Stanley Jackson (OCFO Chief of Staff). Davis informed each of the above of the financial discrepancies contained in the District's and PBC's FY 1999 financial statements. Davis also advised members of the District's City Council, including Sandy Allen and Kevin Chavous, that the District's audit for FY 1999 was fraudulent with respect to the PBC, and that the financial status of D.C. General was not as dire as the OCFO, Control Board, and Mayor's office were claiming.

38.     In August 2000, Davis was again summoned to a meeting regarding the Black Book, this time by Mr. Hunter Clark, the OCFO General Counsel. Present at the August 2000 meeting from Davis & Associates were Davis, Irvin Bloom, Michael V. Bonner, and James Roark. Accompanying Davis were a number of consultants who Davis & Associates had hired in preparing the Black Book, including Phyllis Thompson, Esq. (attorney at Covington & Burling), William Toby (former Acting Administrator for HCFA), William Copeland (a nationally recognized DSH expert), and Jack Martin (a CPA, nationally recognized expert on Medicare and Medicaid financing, and former chairman of the HHS Provider Reimbursement Review Board). Present at the August 2000 meeting on behalf of the District were Clark (the OCFO General Counsel), Wayne Witkowski (Office of Corporation Counsel, Senior Counsel), and a Ms. Perry (Office of Corporation Counsel, Medicaid Counsel). Mr. Clark asked Davis to once again present all of the evidence and analysis supporting the Black Book claims. The District's representatives,

including Mr. Clark responded favorably to Davis's presentation, and appeared convinced that the Black Book claims were legitimate, and worth pursuing as a receivable of the PBC.

39.     Near the conclusion of the meeting, Mr. Clark asked Davis how the District Government could draw down the FFP related to the $180 million identified in the Black Book – or, as Mr. Clark put it: "how do we actually get the cash?" Davis explained that the normal process for drawing down Medicaid reimbursements (the bulk of the Black Book claims) would be to have MAA reimburse the provider (*i.e.*, D.C. General) out of the District's Medicaid account. Mr. Clark and the other District representatives reacted negatively to this suggestion.

40.     Mr. Clark made clear, at the August 2000 meeting, that the OCFO did not want to go through MAA to draw down the Black Book funds. Davis then reminded Mr. Clark that, under the Control Board Act, the DC-CFO had power over every account that was controlled by any agency of the District Government, including the District's Medicaid account. Therefore, DC-CFO Gandhi was able to order that the Medicaid reimbursements associated with the Black Book be withdrawn from the District's Medicaid account. Davis believed that it was the OCFO's intent to draw down the money for the purposes of paying D.C. General. Davis informed OCFO General Counsel Clark and the other District representatives who were present that the District was legally obligated to immediately reimburse D.C. General, the Medicaid provider that had performed the services with any money the District drew down from the District's Medicaid account on the basis of the Black Book claims.

*Fraudulent Withdrawal And Diversion Of Medicaid Funds*

41.     On information and belief, at some point subsequent to the August 2000 meeting between Davis and Mr. Clark, most likely on or about September 2000, DC-CFO Gandhi instructed the Mayor's Office of Grants Management to withdraw the Medicaid FFP associated

with the Black Book claims ("the Black Book Medicaid FFP") from the District's Medicaid
account.

42.    The District Government has acknowledged in a court of law that it received the
Black Book Medicaid FFP related to the Black Book claims. The District Government further
acknowledged that the money it received was not paid to D.C. General, and that Davis &
Associates had never been paid for its work on the Black Book. *See Davis & Associates v.
Williams*, 03-CV-284, Oral Argument, June 8, 2004 (D.C. Ct. App.).

43.    On information and belief, DC-CFO Gandhi instructed that the Black Book
Medicaid FFP be withdrawn from the District's Medicaid account with full knowledge that it
would not be used to reimburse the entity that provided actual services under the District's
Medicaid plan, or to cover the District's prior reimbursements for such services provided to
Medicaid eligible patients. Thus, the District Government withdrew the Black Book Medicaid
FFP on false pretenses, and with an intent to defraud HHS, CMS, and the United States Treasury.

44.    On information and belief, at the time the Black Book Medicaid FFP was
withdrawn from the District's Medicaid account, DC-CFO Gandhi caused a new financial account
to be created within the District's Department of Health named "Public Benefit Corporation Fund"
("the dummy account"). This dummy account was not created for, nor controlled by the PBC.
DC-CFO Gandhi caused the dummy account to be created at the same time that the PBC Fund
created by D.C. Code § 32-262.6 still existed, and the PBC and D.C. General were still operating.

45.    On information and belief, DC-CFO Gandhi caused the dummy account to be
created for the purpose of concealing the diversion of the Black Book Medicaid FFP that had been
withdrawn from the District's Medicaid account on false pretenses. Under both Federal and
District law, DC-CFO Gandhi and the District Government were obligated to turn Medicaid

monies withdrawn from the District's Medicaid account over to the actual provider of the services underlying the claims – in this case D.C. General.

46.     On information and belief, after depositing the Black Book Medicaid FFP into the dummy account, DC-CFO Gandhi then caused that money to be diverted, directly and indirectly, into the District's General Fund. This diversion allowed the OCFO and the District Government to claim a surplus for FY 2000. By showing a budget surplus for FY 2000, the District Government was able to end the Financial Control Board's jurisdiction on September 30, 2001.

47.     None of the Black Book Medicaid FFP was ever paid to D.C. General. Moreover, the District never paid its own 30% share of the reimbursements associated with Black Book. Indeed, neither the District or MAA reimbursed D.C. General any amounts whatsoever associated with the Black Book.

48.     Because Davis's compensation for investigating, compiling, and presenting the Black Book claims was contingent on D.C. General's receipt of payment on those claims, and D.C. General never obtained any payment due to DC-CFO Gandhi's diversion, Davis was never compensated for the work it performed.

*Fraudulent Certification Of Medicaid Spending*

49.     On information and belief, at some time subsequent to the withdrawal of the Black Book Medicaid FFP from the District's Medicaid account, MAA filed (either on paper or electronically) one or more CMS-64 form(s) claiming Medicaid spending of up to $210 million associated with the Black Book and revised FY 1999 cost report claims. No portion of that $210 million was ever paid to D.C. General, instead those monies were diverted by DC-CFO Gandhi, at least in part to improve the overall financial outlook of the District.

50.     As part of completing the CMS-64 form(s), an agent or officer of the District Government was required to certify, and did certify, to CMS that the "report only includes

expenditures under the Medicaid program" and that the "expenditures included in the report are based on the [District's] accounting of actual recorded expenditures, and are not based on estimates." MAA is required by CMS to retain all documents supporting the claims underlying the expenditures aggregated in the CMS-64 form(s). In this case, MAA did not (and does not) have the supporting records it would need in the event of a CMS audit, because all of those records had been turned over to Davis by the PBC so that Davis could use them to prepare the Black Book.

51.    Because the $210 million at issue had not been reimbursed to the actual provider of the underlying services, D.C. General, but had instead been diverted into the District's General Fund where it was used for all manner of non-Medicaid related purposes, the certification and claims on the CMS-64 form(s) were false. The CMS-64 form filed by the District Government while it had full knowledge (through DC-CFO Gandhi and other officials) that none of these reimbursements had been paid to D.C. General. Thus, when it submitted the CMS-64 form(s) the District Government knowingly submitted a false claim and/or a false statement or record in support of a false claim with the intent to defraud HHS, CMS, and the United States Treasury.

52.    Following the illegal diversion of the Black Book Medicaid FFP and the additional approximately $40 million identified after the review of the FY 1999 cost report, District Government Officials, including Mayor Anthony Williams, DC-CFO Gandhi, and the Financial Control Board, continued to claim that D.C. General was a serious drain on the District's finances. By withholding Medicaid reimbursements from the PBC, they were able to declare that the PBC was "bankrupt." In 2001, the PBC was dissolved and D.C. General was closed, leaving thousands of lower-income citizens of the District with significantly diminished access to healthcare.

53.    When the PBC was dissolved and D.C. General closed, Davis was still in possession of the D.C. General records that it had used to compile the Black Book claims. Davis

continues to possess these books and records. Davis was a direct witness to many of the events leading up to the District's fraud, including the August 2000 meeting with the OCFO. Davis was, therefore, aware of the District's illegal conduct well before such conduct did, or could have, become a matter of public knowledge. Because Davis continues to possess many of the underlying books and records relating to the District's fraud, Davis possesses unique and detailed knowledge of the District's false claims. Davis has personally suffered as a result of the District's conduct. Thus, Relator Davis is an original source of the information and allegations contained herein, as he has direct and independent knowledge of all information on which this claim is based.

54.    The District's false or fraudulent claims damaged the United States because they allowed the District Government to obtain at least $147 million in Federal Medicaid funds to which it was not entitled by law.

## COUNT I
(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1))

55.    The United States, through the Relator, hereby realleges and reincorporates Paragraphs 1 through 54 as if fully set forth herein.

56.    The District Government violated the False Claims Act by knowingly presenting a false claim for Medicaid reimbursement to CMS. The claim was false because at the time the DC-CFO directed that the funds be taken from the District's Medicaid account, the District intended to use the money for the benefit of the District of Columbia General Fund and did not intend to reimburse D.C. General as required by law. As a result of taking the Federal Medicaid funds, and not reimbursing D.C. General, the District falsely certified to CMS that the money had been paid to D.C. General to reimburse the healthcare provider for services provided to eligible

Medicaid recipients. This was a material false statement as it was a prerequisite to obtaining FFP payments under the Medicaid statutes.

57.    By virtue of the false or fraudulent claims made by the District of Columbia, the United States suffered damages because it paid out at least $147 million in Medicaid FFP to MAA, which was not entitled to receive such funds. Accordingly, the United States is entitled to statutory damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT II
### (False Claims Act: Making or Using False Record or Statement)
### (31 U.S.C. § 3729(a)(2))

58.    The United States, through the Relator, hereby realleges and reincorporates Paragraphs 1 through 57 as if fully set forth herein.

59.    The District Government violated the False Claims Act by knowingly making, using or causing to be made or used, false records or false statements to get a false claim for Medicaid reimbursement from the Federal Government. Because the $210 million in Medicaid reimbursements certified and claimed by MAA on its CMS-64 form(s) was never paid to D.C. General, there was no actual Medicaid expenditure. Accordingly, the District's certification of such payments on the CMS-64 form was false. The District's false certification on the CMS-64 form was material because it caused CMS to pay the District at least an additional $147 million in FFP.

60.    By virtue of the false or fraudulent records and statements made by the District of Columbia, the United States suffered damages and is entitled to statutory damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT III
(False Claims Act: Conspiring to Defraud the Government)
(31 U.S.C. § 3729(a)(3))

61.     The United States, through the Relator, hereby realleges and reincorporates Paragraphs 1 through 60 as if fully set forth herein.

62.     The District Government violated the False Claims Act by knowingly conspiring with the persons and entities described herein, and with others, to defraud the Federal Government by getting a false or fraudulent claim allowed or paid.  Because the Black Book Medicaid FFP withdrawn from the District's Medicaid account, and the $210 million in Medicaid reimbursements certified and claimed by MAA on its CMS-64 form(s) were never paid to D.C. General, there was no actual Medicaid expenditure.  Accordingly, the District's drawdown of those monies, and request for reimbursement on the CMS-64 form(s) was done to induce the payment of monies by CMS to which the District was not entitled.  The District's false certification on the CMS-64 form was material because it caused CMS to pay the District at least an additional $147 million in FFP, to which the District was not entitled.

63.     By virtue of the District's conspiracy to defraud CMS, the United States suffered damages and is entitled to statutory damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States, through the Relator, demands and prays that judgment be entered in its favor against the defendant on Counts I, II and III under the False Claims Act, as amended, for the amount of statutory damages, and such civil penalties are required by law, together with all such further relief as may be just and proper.

Dated:  March 15, 2006

Respectfully submitted,

Anthony T. Pierce (D.C. Bar No. 415263)
Scott M. Heimberg (D.C. Bar No. 412204)
Tobias E. Zimmerman (D.C. Bar No. 475202)
AKIN GUMP STRAUSS HAUER & FELD LLP
Robert S. Strauss Building
1333 New Hampshire Ave, N.W.
Washington, D.C. 20036
Telephone: 202.887.4000
Facsimile: 202.887.4288

*Attorneys for Relator*
*Michael L. Davis*