# GAO Report Title: Anti-Deficiency Act Violation Involving the District of Columbia Health and Hospitals Public Benefit Corporation, B-285725, September 29, 2000.

EXHIBIT B

TITLE: Anti-Deficiency Act Violation Involving the District of Columbia Health and Hospitals Public Benefit Corporation, B-285725, September 29, 2000
BNUMBER: B-285725
DATE: September 29, 2000
******************************************************************
Anti-Deficiency Act Violation Involving the District of Columbia Health and Hospitals Public Benefit Corporation, B-285725, September 29, 2000

B-285725

September 29, 2000

The Honorable Ernest J. Istook, Jr.
Chairman, Subcommittee on the District of Columbia
Committee on Appropriations
House of Representatives

Subject: Anti-Deficiency Act Violation Involving the District of Columbia Health and Hospitals Public Benefit Corporation

Dear Mr. Chairman:

This responds to your letter asking whether there has been any violations of the Antideficiency Act by the District of Columbia Health and Hospitals Public Benefit Corporation (PBC) or the District of Columbia government. Your request was prompted by published news reports that the PBC had drawn $60 million in unbudgeted cash from the District of Columbia General Fund. As part of our review, we requested the views of the District of Columbia's Chief Financial Officer (CFO) and the District of Columbia's Corporation Counsel to a number of questions raised by your inquiry. We received their joint response by letter dated July 24, 2000 (D.C. submission). We also obtained the views of the PBC's General Counsel by letter dated August 16, 2000 (PBC submission).

Your request raises two substantive issues:

1. Did the PBC violate the Antideficiency Act in fiscal years 1997 through 2000 by obligating more than the Congress appropriated for those fiscal years?
2. Did the PBC and the District of Columbia violate the Antideficiency Act in fiscal years 1997 through 2000 by using the District of Columbia General Fund to pay PBC liabilities during those fiscal years in excess of the resources PBC ultimately realized?
3. For the reasons discussed below and in greater detail in the enclosed analysis, we conclude that, for fiscal years 1997 through 2000, (1) the PBC violated the Antideficiency Act by obligating more than the Congress appropriated, and (2) the PBC and the District of Columbia violated the Antideficiency Act by using the District of Columbia General Fund to pay PBC liabilities in excess of the resources PBC ultimately realized.

   Prior to the establishment of the PBC in 1997, the District paid the liabilities of DC General Hospital (the predecessor to the PBC) from the General Fund. To the extent payments exceeded resources available to the Hospital, the District and the Hospital treated the excess payments as "loans" for accounting purposes. By the end of fiscal year 1994 the amount of the "loans" exceeded $85 million. As of September

protecting human life permits it to incur obligations in excess of amounts provided. Nothing that we have been provided warrants the conclusion that the overobligations resulted from an unanticipated emergency rather than from the PBC's failure to manage and live within its budgetary resources during the fiscal year.

Alternatively, the District asserts that the Congress ratified the "advances" and writing off the total amount of "loans" without charging an appropriation. We disagree. There is no legislation that expressly or impliedly ratifies the District's practice of making "advances" and not charging the resulting obligations against an available appropriation.

In conclusion, the District and the PBC are not authorized to incur obligations in excess of the amounts appropriated for the PBC, and a reportable violation of the Antideficiency Act therefore has occurred. The District of Columbia should submit to

the President and Congress the report required by 31 U.S.C. sect. 1351 (1994) in accordance with the guidance contained in OMB Circular A-34 (revised October 19, 1999).

Sincerely yours,

Anthony H. Gamboa
Acting General Counsel

Enclosure

Antideficiency Act Violation by District of Columbia Health and Hospitals Public Benefit Corporation

A review requested by the Chairman, Subcommittee on the District of Columbia, House Committee on Appropriations, raised two issues:

4. Did the PBC violate the Antideficiency Act in fiscal years 1997 through 2000 by obligating more than the Congress appropriated for those fiscal years?
5. Did the PBC and the District of Columbia violate the Antideficiency Act by using the District of Columbia General Fund to pay during those fiscal years PBC liabilities in excess of the resources PBC ultimately realized?

For the reasons discussed below, we conclude that, for fiscal years 1997 through 2000, (1) the PBC violated the Antideficiency Act by obligating more than the Congress appropriated, and (2) the PBC and the District of Columbia violated the Antideficiency Act by using the District of Columbia General Fund to pay liabilities of the PBC in excess of the resources PBC ultimately realized.

BACKGROUND

Advances to DC General Prior to 1997

In the early 1990s, the District's financial condition had deteriorated to the point that there were significant concerns over its ability to operate and pay its bills. One of the sources contributing to the District's financial problems was the worsening financial condition of the D.C. General

Hospital (Hospital). In June 1994, we reported that as of September 30, 1993, the D.C. General Hospital had a $109 million accumulated deficit, $58 million of which had been funded through what were characterized as "loans" from the District. [3] The "loans" were in addition to amounts that the District paid the Hospital for uncompensated patient services from funds appropriated by the "Human Support Services" account. [4] We also reported that the District did not request (with the exception of fiscal year 1990) a supplemental or deficiency appropriation or reprogram funds within the Human Support Service appropriation account to cover the deficits. Instead, the District transferred funds from the General Fund directly to the Hospital Fund to finance the deficit and booked a General Fund receivable and a Hospital Fund payable to account for the transfer of funds. [5]

Establishment of the PBC

Among the proposals made to the District to help address the Hospital's deficit operation was the proposal to transfer the Hospital to a Public Benefit Corporation and to restructure the provision of health care in the District. [6] In 1997, the District of Columbia determined that the provision and delivery of comprehensive community centered health care and medical treatment for District residents could be accomplished most efficiently and effectively by establishing the PBC as a nonprofit public benefit corporation with a separate legal existence within the District government. [7] Accordingly, the District transferred to the PBC the health care functions, assets, property, records, and obligations of, among others, the D.C. General Hospital and the community health clinics. [8] The law established the Health and Hospitals Public Benefit Corporation Fund (PBC Fund) to account for PBC collections and payments separate from the District's General Fund. [9]

A 13 member Board of Directors governs the PBC. The Mayor, subject to City Council approval, appoints 6 members and the City Council appoints 5 members to the Board. The Chief Financial Officer of the District serves as an ex officio voting member of the Board and the General Manager serves as an ex officio nonvoting member of the Board. [10] The Mayor may remove any member from the Board for misconduct, neglect of duty (as defined in the PBC by-laws), failure to maintain District residency, or for other good cause after notice to the Board member and the Board. [11] During a control year (including 1997 through 2000), the CFO exercises control over the management and accounting of funds available for the operation of the PBC. [12]

The law authorizes the PBC to borrow generally, without specifying the source of the credit. [13] However, no law expressly authorizes the District to make loans or otherwise advance cash to the PBC. This lack of express authority is in contrast to the laws conferring authority on federal agencies and instrumentalities to borrow from the United States Treasury. See, e.g., 39 U.S.C. sect. 2006 (1994) (borrowing by the Postal Service); 29 U.S.C. sect. 1305 (c) (1994) (borrowing by the Pension Benefit Guaranty Corporation). See also 2 U.S.C. sect. 661d(c) (1994, Supp. IV 1998) authorizing
Treasury to lend cash to agency financing accounts in order to provide a portion of the cash used to make loans to the public.

Pooled Cash Advances

The District submission [14] indicates that it centrally manages its cash by pooling together available monies from its various operating and capital

30, 1994, the District of Columbia accounted for the $85 million in "loans" as uncollectible in an allowance account. Thereafter, the District wrote off the uncollectible "loans" without obligating the full "loan" amount against an appropriation account.

Following the District's establishment of the PBC in 1997, the District has "advanced" cash to the PBC from the General Fund to pay PBC liabilities. As with the Hospital, the District has advanced amounts in excess of the amount annually appropriated to subsidize PBC operations for nonreimbursed services. The District states that it has made short-term advances to provide the PBC with cash until the PBC could convert receivables to cash and repay the District's General Fund. However, according to District officials, such amounts are unlikely to be repaid.

Since the establishment of PBC in 1997, the District has made "advances" to PBC in the total amount [1] of approximately $99,059,000 as follows: $58,000,000 during fiscal year 2000, $29,154,000 during fiscal year 1999 and $12,261,000 during fiscal year 1998. The "advances" to PBC are in addition to the line item amount of the transfer to PBC from the District's General Fund pursuant to the District's appropriation act.

What the District has characterized as "loans" or "advances" to the PBC are in fact payments made on behalf of the PBC from the District of Columbia General Fund. The District used pooled cash to make these payments, which have turned out to exceed the resources that PBC actually had available. These disbursements from the General Fund to cover services provided by the Hospital should have been obligated against, and liquidated from, an appropriation made by law.

In addition, during fiscal years 1997 to 2000, PBC incurred obligations that exceeded the total amount appropriated in the following approximate amounts: for fiscal year 2000 as of September 5, 2000, $9,997,000; for fiscal year 1999, $6,380,000; for fiscal year 1998, $11,138,000; and, for 1997, $5,869,000. [2] These overobligations are unrelated to, and independent of, the amount of the District's "advances" to PBC. Instead these amounts represent obligations in excess of the total amount appropriated by the "District of Columbia Health and Hospitals Public Benefit Corporation" account for each fiscal year from both the District's General Fund and other funds.

The District takes the position that obligations in excess of amounts appropriated were authorized by the exception to the Antideficiency Act for "emergencies involving the safety of human life." 31 U.S.C. sect. 1342 (1994). We disagree. Clearly, as part of its functions, the PBC has provided services involving the safety of human life. Like other entities subject to the Antideficiency Act whose activities impact on the safety of human life, appropriations once enacted, and unless adjusted by supplemental appropriations or other authority, represent the amount of budget authority available to support PBC activities. While the failure of Congress to enact appropriations at the beginning of the fiscal year may qualify as an emergency event for purposes of section 1342, it would be a novel proposition, one that we are unwilling to endorse, to conclude that an agency's failure to manage and live within the resources provided for an activity involved in

Act except to the extent that the law otherwise authorizes the obligations. Regardless of whether the payments made from the District General Fund on behalf of the PBC are characterized as disbursements, loans, or advances, the liabilities being liquidated still must be recorded as obligations against an available appropriation. The District Corporation Counsel's Office over the years has in effect advised its clients that such is the law. [30] Thus, there must be an appropriation to support a payment for services. Stated conversely, a payment of an obligation may only be made when supported by an appropriation. Finally, officers or employees may not incur obligations against anticipated receipts or a requested supplemental appropriation because anticipated receipts may not be realized or the requested supplemental may not be enacted into law. [31]

As indicated above, the District established the PBC as a nonprofit public benefit corporation within the District government. The PBC officers and employees are officers and employees of the District of Columbia government subject to the Antideficiency Act's requirements. [32] However, in view of the powers conferred on the Mayor and CFO vis a vis PBC with respect to its finances and management operation, the District of Columbia and the PBC have shared responsibility for monitoring and controlling the PBC obligations incurred against cash advances. Thus, in our view, both have a responsibility to ensure compliance with the requirements of the Antideficiency Act.

District's Asserted Authority

The District asserts that the advances and expenditures made may be considered as authorized by law because:

1. all the obligations and expenditures incurred as a result of the cash advances satisfy the exemption in the Antideficiency Act for emergency expenditures involving the safety of human life; and
2. by enactment of the appropriation acts for fiscal year 1994 and 1995, Congress ratified the advances of $85 million through fiscal year 1994.

Authorized Emergency Expenditure

The District asserts that an exception to the Antideficiency Act's prohibition on accepting voluntary services set forth in 31 U.S.C. sect. 1342 (1994) authorized it to incur obligations represented by excess payments from pooled cash that were not repaid. Section 1342 prohibits an officer or employee of the District of Columbia government from accepting voluntary services or employing personal services exceeding that authorized by law "except for emergencies involving the safety of human life or the protection of property." Section 1342 further provides that the term "emergencies involving the safety of human life or the protection of property does not include ongoing regular functions of government the suspension of which would not imminently threaten the safety of human life of the protection of property."

The District points out that the Attorney General has construed section 1342 as authority for an agency to incur obligations during a funding gap (temporary lapses in an agency's budget authority resulting from the failure to enact the agency's appropriations by the start of the fiscal year) in emergency situations involving safety to human life or the protection of property. [33] The funding gap situations discussed by the Attorney General arise typically at the beginning of a fiscal year because of the absence or

expiration of budget authority under circumstances that are beyond an agency's control. In the present situation, the exhaustion of appropriations occurred during the fiscal year because of a rate of operations and obligations in excess of available resources. Viewed in this light, PBC's failure to regulate its activities and spending so as to operate within its available budget resources is not the type of "emergency" covered either by the Attorney General's earlier opinions or 31 U.S.C. sect. 1342.

The District and PBC address this question by asserting that everything the PBC does as part of the general ongoing operation of the hospital and clinics to provide health care services is essential to the protection of human life. While we agree that services such as inpatient medical care and emergency outpatient service contribute significantly to the safety to human life, we think that this argument misses the point. The PBC (like a number of federal agencies, e.g., U.S. Secret Service, U.S. Capitol Police, Bureau of Prisons, Veterans Administration) requests and receives appropriations to cover the costs of providing services essential to the protection of life. Like other similarly situated federal entities, the Congress may reasonably expect the PBC and the District to consider this fact when preparing the budget request for submission to the Congress. Once the Congress enacts appropriation, it is incumbent on the PBC (and similarly situated federal agencies) to manage its resources to stay within the authorized level. Nothing in the District's Submission demonstrates that the PBC's exhaustion of appropriations prior to the end of the fiscal year was caused by some unanticipated event or events (e.g., mass injuries resulting from hurricane, flood or other natural disasters) requiring PBC to provide services for the protection of life beyond the level it should have reasonably been expected to anticipate when it prepared its budget.

Moreover, to accept the District and PBC's argument that everything the PBC does qualifies under the section 1342 exception for "emergency" service would nullify the oversight and control provided by the appropriation process and would provide the PBC with unlimited authority to incur obligations to fund its operations. While the PBC may have to confront emergencies that qualify under the section 1342 exception, we are unwilling, for obvious reasons, to agree with PBC's expansive reading of its authority under this provision of law.

Finally, even in situations where section 1342 authorizes a District officer or employee to incur obligations, it does not authorize a District officer or employee to pay the obligations until an appropriation is enacted for that purpose. [34] However, the PBC not only incurred obligations, the District continued to pay them by accessing pooled cash on PBC's behalf. This over expenditure constitutes a violation of the Antideficiency Act independent of any over obligation of available appropriation.

Ratification

Courts have long recognized that Congress may ratify that which it could have authorized. Swayne & Hoyt, Ltd. v. United States, 300 U.S. 297, 301-302 (1937) and Mattingly v. District of Columbia, 97 U.S. 687, 690 (1878). Furthermore, Congress may effect a ratification through appropriation acts. Greene v. McElroy, 360 U.S. 474 (1959); Brooks v. Dewar, 313 U.S. 354, 361 (1941); Isbrandtsen-Moller Co. v United States, 300 U.S. 139, 147-148 (1937). To conclude that Congress through the appropriation process has ratified agency action, three factors generally must be present. First, the agency takes the action pursuant to at least arguable authority ; second,

During fiscal years 1997 to 2000, the PBC incurred obligations in excess of the total amount appropriated for each of these fiscal years by the following approximate amounts: [19] $9,997,000, estimated as of September 5, 2000, for fiscal year 2000; $6,380,000 for fiscal year 1999; $11,138,000 for fiscal year 1998; and $5,869,000 for fiscal year 1997. These amounts represent overobligations unrelated to the cash advance issue and resulted from the PBC incurring obligations in excess of the total amount appropriated to it for each fiscal year in the account entitled "District of Columbia Health and Hospitals Public Benefit Corporation".

DISCUSSION

Section 446 of the District of Columbia Home Rule Act, as amended, [20] provides that "no amount may be obligated or expended by a District government officer or employee unless the amount has been approved by an act of Congress and then only according to that act." The Home Rule Act requires the District to prepare its annual budget on the assumption that proposed expenditures resulting from financial transactions undertaken (either on an obligation or cash outlay basis) for a fiscal year will not exceed estimated resources from proposed and existing sources. [21] The Home Rule Act recognizes that the District may submit supplemental and deficiency budget requests to cover increased spending when appropriate. [22] In addition, the District may engage in short term borrowing within prescribed limits (1) to compensate for cash shortfalls caused by unrealized resources or (2) to meet cash flow needs. [23] During a control year, the Chief Financial Officer prepares (with the approval of the Authority) the estimate of revenues that is binding on the Mayor and Council in preparing and submitting the budget to Congress and the President. [24]

The Antideficiency Act [25] prohibits District government officers and employees from making obligations or expenditures in excess of amounts available in an appropriation or fund unless they are otherwise authorized to do so by law. 31 U.S.C. sect. 1341 (1994). Only an appropriation may authorize an obligation and expenditure from the General Fund or any other fund. To control the rate of obligation, the Antideficiency Act requires that appropriations or funds be apportioned so as to prevent obligation or expenditure thereof in a manner that would indicate a necessity for deficiency or supplemental appropriations for such fiscal year. [26] The Chief Financial Officer during a control year is responsible for apportioning all appropriations and funds available for obligation during a fiscal year. [27] The Antideficiency Act precludes officers or employees of the District from making or authorizing an expenditure or obligation in excess of an apportionment. [28] While the CFO is responsible for apportioning appropriations and funds to the agency or activity that will be incurring the obligations, it is the responsibility of each agency or activity to manage its funds to avoid over-obligation or over-expenditures of its available resources.

In its submission to us, the District discussed GAAP accounting at length to support the manner in which it reported the "advances" in its financial statements. However, GAAP accounting concepts are not germane here. Whether a violation of the Antideficiency Act has occurred is a function of obligational accounting. [29] For purposes of obligational accounting, all transactions (i.e., liabilities) must be recorded against an appropriation account when they are incurred (e.g, when a contract is awarded or when services are performed). When the obligations exceed the amounts currently available for such obligations, there is a violation of the Antideficiency

project funds.

PBC participates in the District's cash management pool. The District uses pooled cash when making payments on behalf of PBC to employees, vendors, service providers, contractors and others. When the PBC overspends or overdraws its share of the pooled cash, it has a liability to the District's General Fund (which essentially has loaned the cash to the PBC). The cash is advanced for cash flow purposes with the expectation that it will be repaid when the PBC converts accounts receivable to cash. While the District indicates that the cash advance is to be short-term, District officials advise that the advances made to PBC are unlikely to be repaid. [15]

In light of the District's explanation it is clear that what the District has characterized as "loans" or "advances" to the PBC are in fact payments made on behalf of the PBC from the District of Columbia General Fund using pooled cash that have turned out to be in excess of the resources that PBC actually had available. These disbursements from the General Fund to cover services provided by the Hospital should have been obligated against, and liquidated from, an appropriation made by law.

The amount of the unrepaid cash advances to PBC since its establishment in 1997 total approximately $99,059,000 as follows: $58,000,000 during fiscal year 2000, $29,154,000 during fiscal year 1999, and $12,261,000 during fiscal year 1998. These advances were in addition to the amount appropriated to PBC from the District's General Fund. [16]

Appropriations to PBC

The fiscal year 2000 District of Columbia Appropriation Act account entitled "District of Columbia Health and Hospitals Public Benefit Corporation" appropriates to the PBC "$133,443,000 of which $44,435,000 shall be derived by transfer from the General Fund and $89,008,000 from other funds." [17] Similar language has been used to make appropriations to PBC and its predecessor since 1996. These amounts are reflected in the following table:

| Fiscal Year | 2000 | 1999 | 1998 | 1997 |
|---|---|---|---|---|
| Public Law | 106-113 | 105-277 | 105-100 | 104-194 |
| General Fund Transfer | $44,435,000 | $46,835,000 | $44,335,000 | $59,735,000 |
| Other Funds | $89,008,000 | $66,764,000 | $52,684,000 | $52,684,000 |
| Total | $133,443,000 | $113,599,000 | $97,019,000 | $112,419,000 |

The General Fund Transfer amount covers the District's share of funding for PBC's services that are not reimbursed. The amounts appropriated from "other funds" represent the amounts that PBC expects to receive from third party payments (such as Medicare, Medicaid, commercial insurance, or self-insurance) for patient services. The PBC annual budget submission indicates that the amounts appropriated directly to PBC do not include amounts the PBC receives as payments from the District for services provided to other District agencies and some grant money for Maternal and Child Health Care (MCHC) and the School Nurses Program. [18]

the Congress has specific knowledge of the facts; and third, the appropriation of funds clearly bestows the claimed authority. Ex Parte Endo, 323 U.S. 283, n. 24, 303 (1944); D.C. Federation of Civic Associations, Inc. v. F. Aires, 391 F. 2d 478, 481-482 (D.C. Cir. 1968); and, Wade v. Lewis, 561 F. Supp. 913, 944 (N.D. Ill., 1983).

The District relies on a number of events to support its ratification argument. The 1994 financial viability plan for the hospital summarized the financial situation facing it as follows:

"As a result of operating losses incurred by D.C. General Hospital during fiscal years 1990 through 1993, Hospital cash deficits totaled approximately $58 million. The District has funded the cash deficits through the General Fund in order to pay Hospital vendors and creditors. Current levels of District appropriations and net cash provided from Hospital operations preclude the Hospital from repaying these funding advances in the near future."

"As part of the fiscal solvency plan for D.C. General Hospital, the District has developed a plan to retire the $58 million debt at a rate of $10 million per year beginning in 1996 until the debt is retired. The debt retirement will take the form of a loan forgiveness program for D.C. General Hospital and will not require any fund transfers." [35]

While this plan was being discussed, the District of Columbia Appropriations Acts for fiscal years 1995 and 1994 each appropriated $10 million for the purpose of reimbursing the General Fund for costs incurred for the operation of the Hospital. These amounts were provided in the account entitled "D.C. General Hospital Deficit Payment" [36] After fiscal year 1995, the District did not request additional amounts to reimburse the General Fund for the cash deficit and Congress enacted no appropriations expressly for this purpose.

The material entitled "D.C. General Hospital Deficit Reduction," District of Columbia Fiscal Year 1996 Operating Budget, Vol. II, indicates that the District reduced its FY 1996 budget request for the deficit reduction from $10 million for the prior year to zero. It also indicates that the FY 1996 and FY 1995-revised budget requests were based on a new strategy implemented with the completion of the FY 1994 audit. It also states that the audit required the city to reserve $85 million for the accumulated deficit that was recorded as a current asset in the general fund.

During hearings on the District's 1996 appropriation request, John W. Hill, Jr., Director, Financial Management Policies and Issues, Accounting and Information Management Division, General Accounting Office, responding to questions from House Appropriations Committee, Subcommittee for the District, pointed out that the amounts that the District characterized as "loans" had never been appropriated and recorded as an expenditure. He pointed out that in order to charge the advances to the budget, the District would have to have the budgetary resources or the authority to do that. Lacking the budgetary resources or the authority, the advances could be considered a potential Antideficiency Act violation. [37]

Although the District wrote off $85 million in loans to the Hospital prior to the establishment of the PBC, nothing we are aware of demonstrates that the entire $85 million was ever charged to an appropriation. The District enacted a law forgiving $29 million owed by the Hospital to the District

prior to creation of the PBC, [38] and the Report of the House Appropriations Committee that accompanies the District of Columbia Appropriations Act for fiscal year 2000 so noted. [39] However, we are unaware of any legislation passed by Congress that either expressly or by reasonable implication authorized the District to write off any amount without charging an appropriation made by Congress. [40]

The District claims that the Congress ratified the cash advances to D.C. General Hospital by making appropriations in fiscal years 1994 and 1995 to reduce the cash deficit in the General Fund caused by the Hospital's failure to repay prior years advances. It reasons that Congress would not have subsequently approved the repayment of the amounts advanced if it considered them unlawful in the first instance. Finally it claims that Congress' failure to object to the District's action of reserving or otherwise writing off the entire $85 million from an accounting standpoint as proposed by the financial viability plan and the recommendations in the Districts 1996 Operating Budget Prepared for the Congress when coupled with subsequent failure of the Congress to appropriate amounts is further evidence that Congress ratified the advances.

The District's ratification argument fails for a number of reasons. First, as we have already indicated, the advances whether viewed as loans or expenditures presume obligations that were required by law to be charged against appropriations current at the time the services were made. [41] Next, we find the information relied on by the District as constituting notice to the Congress of the action that they were seeking to have ratified as wanting in clarity and precision. In addition, awareness by Congress (to the extent that the awareness of an action by a member or a committee can be imputed) is inadequate to support the ratification unless it is coupled with legislative language that expressly or by reasonable implication can be said to authorize the action taken. The purposes of the 1994 and 1995 appropriations reducing the cash deficit were clear--to authorize a charge against an appropriation of amounts previously spent without authority. However, nothing in the language of either appropriation expressly or by reasonable implication supports the notion that Congress had endorsed an otherwise unauthorized action by the District. It simply reduced the amount of the cash deficit by the amount appropriated to the District to cover some of the overobligations with an appropriated amount. Neither the 1994 nor the 1995 appropriation constitutes congressional ratification of either the practice of making cash advances or writing off of the remainder of the deficit without charging it against an available appropriation.

Further nothing in the 1996 appropriation act supports the ratification claim. The fact that the Congress did not in 1996 appropriate an amount to further reduce the remaining outstanding deficit does not mean that Congress ratified an unauthorized act or cured an Antideficiency Act violation. First, as indicated above the District discontinued its practice of requesting an appropriation for such purpose. Second, the 1996 appropriation act does not provide the District with the authority to write off the cash deficit with or without charge to an appropriation. And third, neither the House nor Senate appropriations committee reports accompanying the District's 1996 appropriation act approve the District's plan to write off the debt or indicate that in light of this plan, they had eliminated funding for such purpose.

Further, a discussion of a plan, however clear, in a budget justification submitted to Congress does not warrant the conclusion that Congress accepts,

approves, endorses, let alone, in a legal sense, ratifies the plan. Congress is under no obligation to address and reject every proposal submitted to it in the budget or authorization process. B-213771, July 10, 1984. Some action at a minimum is needed to demonstrate Congress' approval. [42] In other words, where a grant of authority is needed, silence is not a legislative act that fills the void. Congressional silence does not constitute ratification. Here, nothing we reviewed clearly communicates to the Congress that the District was requesting that Congress ratify or otherwise validate an unauthorized disbursement made by the District in excess of an available appropriation let alone that the Congress enact legislation that expressly or impliedly authorizes the otherwise unauthorized action. While legislative history may be useful to clarify an ambiguity in legislative language, one may not refer to the legislative history to write into the law that which is not there. 55 Comp. Gen. 307, 325 (1975). The District would have us write into the language of the law something that is not even mentioned in the relevant committee reports.

In addition, to accept the argument that a proposal coupled with silence constitutes ratification would raise serious constitutional issues. The Constitution is clear that proposals to enact or change the law must be adopted by Congress and either signed by the President or passed by Congress over the President's veto. U.S. Const., art. 1, sect. 7, cls. 2 and 3. The District's argument would permit proposals to change the requirements of section 446 and the Antideficiency Act to take effect unless Congress and the President took affirmative steps to reject them. The Supreme Court has rejected this view of lawmaking. Clinton v. New York, 524 U.S. 417 (1998); Immigration and Naturalization Service v. Chadha, 462 U.S. 917 (1983).

CONCLUSION

Since the District and the PBC are not authorized to incur obligations in excess of the amounts appropriated for the PBC, we conclude that a reportable violation of the Antideficiency Act has occurred. Accordingly, the District of Columbia should submit to the President and Congress the report required by 31 U.S.C. sect. 1351 (1994) in accordance with the guidance
contained in OMB Circular A-34 (revised October 19, 1999).

Notes

1. We determined the amounts of advances using financial information for several fiscal years (1) reported in the Comprehensive Annual Financial Reports of the District of Columbia (CAFR) containing the annual audited financial statements of the District of Columbia government, (2) the audited PBC financial statements, and (3) PBC internal documents. In September 2000, the District of Columbia's Office of the Chief Financial Officer verified the amounts of advances. The fiscal year 2000 amount of $58 million consists of two amounts--a $48 million projection made by PBC based on actual advances through August 31, 2000, and a projected amount for September 2000, plus a $10 million planned payment to D.C. for Medicaid to settle certain audit years.

2. We determined the amounts of budget excess by adjusting financial information for several fiscal years (1) reported in the Comprehensive Annual Financial Reports of the District of Columbia (CAFR) containing the annual audited financial statements of the District of Columbia government, (2) the audited PBC financial statements, and (3) PBC internal documents. We

adjusted the financial information (1) by reducing the reported expenses to exclude depreciation and bad debt expenses that did not result in actual obligations of the annual operating appropriation and (2) by allowing for capital outlays and obligations up to the amount of reimbursements PBC received for services provided to the District and grants that are not included in the amounts appropriated from "other funds". In September 2000, the District of Columbia's Office of the Chief Financial Officer verified the amounts of the budget excess.

3. Financial Status: District of Columbia Finances at 27, 49 (GAO/AIMD/GGD-94-172BR June 1994).

4. See, e.g., H.R. Rep. 103-558, 41 (1994) and S. Rep. 103-313, 40-41 (1994) accompanying the District of Columbia Appropriations Act, 1995, Pub. L. No. 103-334, Title I, 108 Stat. 2576 (1994). The Hospital subsidy budget request covered the difference between anticipated expenditures (including debt service for capital expenditures and a reserve for bad debts) and anticipated revenues.

5. Financial Status: District of Columbia Finances at 27 (GAO/AIMD/GGD-94-172BR June 1994).

6. See Recommendation 1B of the proposal of the D.C. Financial Responsibility and Management Assistance Authority (Authority) submitted to the Congress on July 15, 1995 and reprinted in the Hearings on the District of Columbia Appropriations For 1996 before a Subcommittee of the House Committee on Appropriations (Part 3), 104th Cong. 28 (1997) and the consultant's recommendation in the "District of Columbia General Hospital Operational and Financial Viability Plan," May 9, 1994, reprinted in the Hearings on the District of Columbia Appropriations for fiscal year 1995 before a Subcommittee of the House Committee on Appropriations (Part 2), 103rd Cong. 2144 (1994).

7. D.C. Code Ann. sect.sect. 32-261.1(c), 32.262.2(a) (1981, 1998 Replacement Volume).

8. D.C. Code Ann. sect. 32.262.7(a)(4) (1981, 1998 Replacement Volume, 2000 Supp.).

9. D.C. Code Ann. sect. 32-262.6 (1981, 1998 Replacement Volume).

10. D.C. Code Ann. sect. 32-262.3(a) (1981, 1998 Replacement Volume, 2000 Supp.).

11. D.C. Code Ann. sect. 32-262.3(j) (1981, 1998 Replacement Volume, 2000 Supp.).

12. See memorandum to Natwar Gandhi, CFO, from Robert Rigsby, Corporation Counsel of the District of Columbia, dated June 19, 2000, discussing the authority of the CFO with respect to PBC funds. The memorandum states that the CFO has custody of all the funds of the PBC and in this capacity has accounting control over (1) all money received by the PBC, (2) all money disbursed by the PBC, and (3) all money invested by the PBC.

13. D.C. Code Ann. sect. 32-262.5(e) (1981, 1998 Replacement Volume).

14. As part of our review, we requested the views of the District of

Columbia's Chief Financial Officer and District of Columbia's Corporation Counsel to a number of questions. We received their joint response by letter dated July 24, 2000 (DC Submission). We also obtained the views of the PBC's General Counsel by letter dated August 16, 2000 (PBC Submission).

15. D.C. Submission, p. 2.

16. We determined the amounts of advances using financial information for several fiscal years (1) reported in the Comprehensive Annual Financial Reports of the District of Columbia (CAFR) containing the annual audited financial statements of the District of Columbia government, (2) the audited PBC financial statements, and (3) PBC internal documents. In September 2000, the District of Columbia's Office of the Chief Financial Officer verified the amounts of the advances. The fiscal year 2000 amount of $58 million consists of two amounts-a $48 million projection made by PBC based on actual advances through August 31, 2000, including a projected amount for September 2000, plus a $10 million planned payment to the District for Medicaid to settle certain audit years.

17. Pub. L. No. 106-113, 113 Stat. 1501, 1511 (1999). Prior to fiscal year 1996, the District appropriations act did not expressly appropriate amounts from grants and receivables from outside sources. The District of Columbia Financial Responsibility and Management Assistance Act of 1995, Pub. L. No. 104-8, sec. 301(a), 109 Stat. 97, 141 (1995), amended section 103 of the District of Columbia Home Rule Act, D.C. Code Ann. sect. 1-202, to require that the District's annual budget submission include all funds received and spent by the District. The District implemented this requirement starting with its budget submission in support of its fiscal year 1996 appropriation request.

18. See, e.g., Hearing on the District of Columbia Appropriations Act for fiscal year 2000 before a Subcommittee of the House Appropriations Committee (Part 2), 106th Cong. 762-764 (2000) and Hearing on the District of Columbia Appropriations Act for fiscal year 1999 before a Subcommittee of the House Appropriations Committee (Part 2), 105th Cong. 712-715 (1999).

19. We determined the amounts of budget excess by adjusting financial information for several fiscal years (1) reported in the Comprehensive Annual Financial Reports of the District of Columbia (CAFR) containing the annual audited financial statements of the District of Columbia government, (2) the audited PBC financial statements, and (3) PBC internal documents. We adjusted the financial information (1) by reducing the reported expenses to exclude depreciation and bad debt expenses that did not result in actual obligations of the annual operating appropriation and (2) by allowing for capital outlays and obligations up to the amount of reimbursements PBC received for services provided to the District and grants that are not included in the amounts appropriated from "Other Funds". In September 2000, the District of Columbia's Office of the Chief Financial Officer verified the amounts of the budget excess.

20. D.C. Code Ann. sect. 47-304 (1981, 1997 Replacement Volume, 2000 Supp.).

21. D.C. Code sect. 47-301(a)(1) (1981, 1998 Replacement Volume).

22. D.C. Code Ann. sect.sect. 47-301(c), (d), 304 (1981, 1998 Replacement Volume,2000 Supp.).

23. D.C. Code Ann. sect.sect. 47-327, 47-328 (1981, 1998 Replacement Volume, 2000 Supp.).

24. D.C. Code Ann. sect. 47-317.3(5) (1981, 1998 Replacement Volume, 2000 Supp.).

25. 31 U.S.C. sect.sect. 1341, 1342, 1349-1351, 1511-1519 (1994). See section 603(e)of the District of Columbia Home Rule Act, as amended, D.C. Code Ann. sect.47-313(e), confirming the continued applicability of the Antideficiency Act to the District of Columbia following the grant of limited self-government under the D.C. Home Rule Act.

26. 31 U.S.C. ch. 15, subch. II, sect.sect. 1511-1519 (1994).

27. D.C. Code Ann. sect. 47-317.3 (13) (1981, 1998 Replacement Volume, 2000 Supp.). Otherwise the Mayor apportions. D.C. Code Ann. sect. 47-310 (a)(9) (1981, 1998 Replacement Volume, 2000 Supp.). The District is currently in a control year and has been in one since fiscal year 1996. Pub. L. No. 104-8, sect. 305(4), 109 Stat. 142 (1995), D.C. Code Ann. sect. 47-393 (1991, 1997 Replacement Volume).

28. 31 U.S.C. sect. 1517(a)(1) (1994).

29. These concepts as embodied in the fiscal statutes that applied to the District prior to the adoption of the Home Rule Act continued unabated following its adoption. Section 603(a) of the Home Rule Act, D.C. Code Ann. sect. 47-313(a) provides that nothing in the Home Rule Act "shall be construed as making any change in existing law, regulation, or basic procedure and practice relating to the respective roles of the Congress, the President,the federal Office of Management and Budget, and the Comptroller General of the United States in the preparation, review, submission, examination,authorization, and appropriation of the total budget of the District of Columbia government. (See, e.g., 31 U.S.C. sect. 1501 (1994).

30. See memorandum from Herbert O. Reid, Sr., Corporation Counsel, to Robert Pohlman, Deputy Mayor for Finance, dated August 7, 1990 (an advance from the capital project fund to the General Fund that was not repaid until the next fiscal year constitutes an expenditure of appropriated funds); memorandum from Wayne C. Witkowski, Deputy Corporation Counsel, Legal Counsel Division, to Earl Cabell, Interim Chief Financial Officer, dated January 27, 1999 (advances from the General Fund to the D.C. General Hospital require an appropriation).

31. D.C. Courts Planning and Budgeting Difficulties During Fiscal Year 1998, 10-14 (GAO/AIMD/OGC-99-226, September 1999).

32. A similar conclusion was reached in the memorandum dated June 19, 2000 from Robert R. Rigsby, Corporation Counsel to Natwar Gandi, Chief Financial Officer. In that memorandum the Corporation Counsel concludes that the PBC would violate the Antideficiency Act if it spends amounts in excess of the amounts appropriated to it or authorized by law.

33. 5 Op. O.L.C. 1, 8 (1981) and Memorandum from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel to Alice Rivlin, Director, Office of Management and Budget, August 16, 1995.

34. 5 Op. O.L.C. fn. 11 at 9-10 (1981) and Memorandum from Walter Dellinger,

Assistant Attorney General, Office of Legal Counsel to Alice Rivlin, Director, Office of Management and Budget, August 16, 1995.

35. "District of Columbia General Hospital Operational and Financial Viability Plan," May 9, 1994, reprinted in the Hearings on the District of Columbia Appropriations for fiscal year 1995 before a Subcommittee of the House Committee on Appropriations (Part 2), 103rd Cong. 2144, 2157 (1994) (Kurron Report).

36. Pub. L. No. 103-334, Title I, 108 Stat. 2576, 2581 (1994) and Pub. L. No. 103-127, Title I, 107 Stat. 1336, 1341 (1993). However, the District of Columbia 1994 Supplemental Appropriations and Rescissions Act rescinded $5.5 million of the $10 million appropriated for that year. Pub. L. No. 103-334, Title II, 108 Stat. 2595, 2597 (1994).

37. Hearings on the District of Columbia Appropriations for Fiscal Year 1996 before a Subcommittee of the House Appropriations Committee (Part 1), 104th Cong. 216-217 (1998).

38. D.C. Code Ann. sect. 32-262.19a (1981, 1998 Replacement Vol., 2000 Supp.).

39. H.R. Rep. No. 106-249, at 84 (1999).

40. The PBC was forgiven another $55 million for amounts owed by the Hospital to the District prior to creation of the PBC as a result of a settlement agreement entered into between the District and the PBC in January of 1999. Under the agreement the District and the PBC compromised claims for amounts each asserted as owing to it by the other.

41. There is no evidence of any written agreement that could be considered an obligating loan document.

42. This would be true even if the plan the District refers to was clear with respect to the authority that the District was requesting by way of ratification. In our opinion, it was not.